We'll go to the next case, Medina v. University of Utah. Good morning, Your Honors. If it may please the Court, my name is Katie Panzer, on behalf of Appellant Christine Medina. I'd like to reserve about four minutes for rebuttal, but we'll see how that goes. This case really comes down to a single, key, and disputed fact. Was the transfer of bio kids to CCFR a legitimate and necessary business decision, as the University has asserted? Or was it a sham orchestrated specifically to get rid of Medina under the guise of a reduction in force? Had the District Court applied the correct standard of summary judgment, viewing the facts in the light most favorable to Medina, it would have concluded that a reasonable jury could find that it was, in fact, fabricated to get rid of Medina. There are two key pieces of evidence that establish this dispute of fact that the District Court ignored. First, a text message from Dr. Dearing to Dr. Sandick, sent April 14th, 2020, that says, Honestly, I think we should take this chance to reboot bio kids. Christine is a disaster. And that's in the appendix at page 1181, and was Exhibit P to the opposition to summary judgment. The second is found in notes taken by Dr. Sandick during a meeting about transferring bio kids to CCFR. She wrote, Immediately riff Christine, bring in a U-Kids program manager or empower Manon. Can get through the nine months riff period, and then reevaluate managerial needs. And that's in the appendix at page 1201, and was Exhibit X to the opposition. Viewing these two exhibits in the light most favorable to Medina, they support an inference that Dr. Dearing made the decision to transfer bio kids to CCFR for the express purpose of being able to fire Medina. Counselor, can I ask you about that? You had several, of course, somewhat related claims growing out of that nucleus of facts. But on the due process claim is what I want to ask you about. You all disagree in the interpretation of the Pitts case, but both of you have sort of dueling assertions on whether or not Ms. Medina could have made an administrative appeal of the HR director's approval of the riff. The University of Utah, or Ms. Dearing, Dr. Dearing, says that, well, you could have appealed that as a procedure. In other words, the HR director should not have approved it because the policy lays out, as you point out, specific reasons, including business justification for the reduction in force. And you say in your reply, well, no, she couldn't. That would not have been a procedure. How do we resolve that? Because on its face, it seems like, of course, you could have administratively appealed that and said, well, the HR director has specific constraints, including business justification. And if it was a sham, if it was all a ruse to get rid of Ms. Medina, then, of course, you could have appealed that HR director Debra should have approved the riff. My understanding of the riff policy is that when it says procedure, it's talking about, the department goes to HR and says, I'd like to get rid of this position. Here are all of the people in this position. And then you start eliminating them by, I think it's temporary employees, probationary employees, employees with discipline, so on and so forth, seniority. That is the procedure that I read the policy to refer to as appealable. Whereas in this case, only one position was named for elimination. And the policy specifically says the naming of a position is not grievable. But why couldn't she have said that in this unique situation, I am not appealing the fact that Ms. Medina was identified as the one person for a riff. The whole antecedent question of whether a riff is justified for a business, legitimate business justification, I am appealing that determination by the HR director. Why couldn't she have appealed that? Well, I think that waiving a due process right, it has to be, there's a strong presumption against it. It has to be knowing and intentional. And the way the riff, the notice of separation informed her of her appeal rights. It didn't seem like an option to appeal that decision. Seems like the way it is written, it reads as if you can only appeal if you believe that your position was, or like your job, you were selected inappropriately, that somebody else should have gone instead of you. On the Christine is a disaster point, does that need to be tied somehow to retaliation? And that explains the riff, or she can think she's a disaster and want to redo the way things are done, right? That's fine. I think that it is tied to retaliation. If you look at if you look at the timeline, there was a meeting with the steering committee on April 13th of 2020, where Dr. Dearing and Dr. Sandek are trying to throw Ms. Medina under the bus for this decision to increase class sizes. And she says, no, that was not my decision. I actually objected to that because it violates state licensing. And then she sends a follow up email the next day to Dr. Dearing that says kind of reiterates that, like, just as a reminder, I objected to this. And so you have the temporal proximity that shows that it was retaliation. And then the very next day, Dr. Dearing is talking to H.R. and saying she'd already been discussing furloughing Medina, but she goes back to H.R. And she says, would it be possible to do a reorganization while I have an employee on furlough? And if you look at that in the light most favorable to Ms. Medina, you can draw the inference that she at that time was already thinking about, because the reorganization happened like a month later. She's already thinking, how can I get rid of Christine? How does that help you? Because prior to all three of those incidents on January the 14th, Ms. Medina had herself sent an email saying, we have been approved. We've been inspected. We have the approval for the 33 preschoolers. We now have approval for a variance for the 12 infants. And we fully expect no problem for the additional space approval for the 12 toddlers. So as of January 14th, prior to all of those incidents, there were going to be no license violations. There weren't going to be no suspected license violations. There were going to be no problems whatsoever. And so then if they say, well, we wanted to get rid of her, how does that become actionable? So I guess two points on that issue. When you go back to the fall, before those licensing approvals happened, her objections really put this target on her back. Dr. Dearing threatened her multiple times and said, if you don't get in line, maybe BioKids will cease to exist. She threatened, she actually threatened to transfer BioKids to UCIDS, CCFR. So it's starting at that period that she has this target on her back for Dr. Dearing. And then that kind of continues through the spring of 2020 and COVID and all of that. Well, the weird part about this case is, so you're right, in October and November, Dr. Dearing is making these comments that you need to get on board with the program. But her task, her requirement is to get the NYACC approval for those voluntary guidelines and to get license approval. She says you need to get on board and do your job, Christina. And she does. In January, she gets all the approvals. And so the weird part about this case, it may be right from what you're saying, but the retaliation is based on complaints. To do your job, to do the one task that you've been tasked with doing, which she then does, and then there's retaliation. So it doesn't fit within the ordinary mold. In other words, there was never a licensing violation. Right. And the university has really argued, well, we were never in violation. But that's not a requirement of the UPPEA. They don't ever have to actually violate the law. Or at least a suspected violation. Right. Well, it protects reports of a violation or suspected violation, but also an objection to or refusal to carry out a directive that the person reasonably believes violates law. So just even objecting, saying, no, I can't put 75 children in this room. Nobody ever said to do that. I mean, they just said, I'm not trying to argue with you. The question is, the defendant then says, well, we didn't tell her to open it up and violate the license. They said, try to get this to conform with the license. And so follow up on Judge Phillips' question. And so then she does that. And so how is there even a suspected violation or an anticipated violation? Because on January 14, 2020, nobody ever thinks that it's going to violate the license. Because she's already gotten fully anticipated approval. Well, the objections happened prior to the approval. And they had to get a variance, right? So there's, under Utah Administrative Code, it says, you know, for this age of child, you can have a maximum group size of eight and a ratio of one to three for various different ages. You can get variances, which the health department can grant and which they ultimately did. At the time she engaged in protected activity, those variances hadn't been granted. And so she reasonably believed the numbers that were being asked of her violated the licensing regulations. What is the significance of it being Dean Trappa and Jerry Basford that decided to transfer bio kits to CCFR as opposed to your defendant? Well, it means that Dr. Dearing would not be liable for the due process violation. So that's a dispute of fact that the district court resolved in defendant's favor. And if there's no other questions, I'd like to reserve my time. Let's stop the clock. Thank you. Good morning, Your Honors. May it please the Court. I'm Joshua Davidson, Assistant Utah Solicitor General on behalf of the Appalachian University of Utah and Dr. Dearing. This court should affirm the district court's judgment in all respects. The district court properly granted summary judgment to Dr. Dearing on Ms. Medina's Section 983 procedural due process claim and to the university on the state law breach of contract and whistleblower claims. I'd like to address those in turn. This court may affirm the grant of summary judgment on the due process claim for two reasons. First, Ms. Medina failed to avail herself of the process that was afforded to her. It is undisputed that the RIF policy applied to her, that the RIF notice that she got explicitly spelled out that she could grieve it if she believed the policies were violated, and that she didn't grieve it. Well, the policy said, your letter in the policy says you can appeal procedures if they're not followed, and right? If you believe university procedures were not followed in this action, you have the right to appeal this action in accordance with the grievance policy, 5203. So isn't the question, and then she says, well, there were no procedures that I'm claiming were not followed. You know, they checked all the boxes. They needed to get HR director's approval. They got HR director's approval. There were no procedures that were not followed. That's not her claim. There were no procedures for her to appeal, and giving the evidence favorably to the plaintiff, why couldn't a reasonable fact finder find that she's right? What procedures were not followed? Well, the sham RIF argument can't be squared with the contention that her RIF didn't violate university procedures. The HR person who had to approve that there was a valid reason for the RIF, that is a procedure. She did it. And she did approve it. So, for example. So, I don't mean to cut you off, but I'm going to ask you the same question I asked opposing counsel. So you say, well, she could appeal that. She says, we can't. I don't know. I think both are plausible arguments. This is summary judgment. We're not interpreting a statute. We're not interpreting a governmental regulation. We're interpreting a university policy that was drafted by the University of Utah. Why can't we say, well, based on the standard for summary judgment, we're going to view the evidence, interpret the evidence, interpret the regulation favorably to Ms. Medina, and a reasonable fact finder could conclude that this would have been a substantive challenge to the HR director's approval since she did approve it. And so there was nothing for her to, procedurally, for her to appeal. Well, that argument might have more teeth if she tried. You know, she didn't even call the appeal coordinator to see if she could grieve it. But if her claim is that the RIF policy itself didn't allow her to properly grieve her RIF, and thus the policy is constitutionally deficient, she failed to produce any evidence that Dr. Medina had any involvement in the creation, adoption, approval, implementation, or enforcement of that policy, which leads to the second reason why this court may affirm, is that Dr. Deering failed to identify the required affirmative link between Dr. Deering's conduct and the alleged constitutional deprivation. It is undisputed at the summary judgment level that CCFR had a long-term goal to centralize the administration of all campus child care under its umbrella, that CCFR contracted with the College of Science to take over the administration of BioKids. It is undisputed that the final decision to transfer BioKids to CCFR was made by Dean Trappa. This isn't something that the court found or resolved. She didn't dispute this fact. Yes, she did. She said, I'm submitting a declaration that I, Ms. Medina, was told by Dr. Vickers that it was Dr. Deering's decision. Shawna Lower testified in her deposition that it was part Dr. Deering's decision and part Pearl's, presumably Dr. Sandick's. And so, why wouldn't that create a tribal effect issue on whether or not Dr. Deering contributed, say, to Dean Trappa's approval of the transfer to this other entity? Well, it's paragraph 41 of Record 87 that she didn't dispute that the final decision was made. CCFR made the decision itself. She doesn't dispute that. The CCFR made the decision not to bring on Medina with the transfer. It had its own administrators already and it wanted somebody that knew its policies. So, CCFR alone made the decision not to bring Ms. Medina over. But wasn't Shawna Lower the head of CCFR? She was the head of CCFR. And so, wouldn't her deposition testimony have substantial credit? If she, the head of CCFR, says that the decision had, in fact, been made by Pearl and Dr. Deering? Well, that doesn't get the CCFR's decision. Like, she's saying that there's some rubber stamping here going on, but the fact that Dr. Deering may have been involved in inquiring about the transfer doesn't mean that she was the final decision maker or the decision maker. Like, it was, the testimony was at a higher level. And it's undisputed that Dr. Deering never spoke to CCFR about Medina's performance or her opposition to the BioKids expansion. And it's undisputed that because there was no child care remaining within the school of SBS, there was no longer a need for Ms. Medina's position. And these are the facts that she did not dispute. And, you know, it is also unrefuted that Dr. Deering, that Medina was never discussed in the party's MOU negotiations. That is the Basford's deposition 903, record 903. Ms. Medina ignores that Dr. Deering was gone. She was on sabbatical. When the MOU was being finalized and executed, when her RIF was issued, Ms. Medina no longer was in the supervisory authority. And there couldn't have been a rubber stamping of anything that CCFR did. There were different reporting lines. CCFR reports to Associate Vice President Basford, who reports to the Vice President of Student Affairs. The SBS director has a different line of reporting to the College of Dean and then to the Senior Vice President of Academic Affairs. So Dr. Deering wasn't the decision maker about what position or employee CCFR wanted. Before we leave the RIF, here's what the district court said. And I want to know if you defend this or if you say that the district court was speaking too broadly. Per the policy, Ms. Medina was notified that she had the right to appeal the termination. Ms. Medina did not appeal her termination and then bounces her on that basis. Did she have the right to appeal her termination? She wasn't terminated. She was RIF'd. And so it's undisputed that the university meticulously followed its RIF policy. And it's because it followed its RIF policy that Ms. Medina has her position back. She was rehired under the RIF policy. So there's no breach of that policy. I would disagree with the court's use of the word termination. You'd insert RIF there. She was RIF'd. She wasn't terminated. She doesn't allege that she was terminated in violation of Section 511. She wasn't disciplined. She admits she wasn't disciplined. She was RIF'd. That doesn't really answer the question, though, does it? I mean, could she? You're saying she had a right to appeal and she didn't pursue it. Did she have a right to appeal? She did. She had a right to appeal. If she believed that the RIF was a sham RIF, she had a right to appeal that decision. And she was RIF'd. She didn't aggrieve it. We think she's waived it. But even if she didn't, there's no affirmative link for the due process claim because Dr. Dering wasn't the decision maker about not keeping on Ms. Medina. So Medina's argument that there is a affirmative link is based on pure speculation, which cannot defeat summary judgment. She admitted in her deposition that she merely suspected it was Dr. Dering. Associate Dean Basford testified he never felt CCFR had been brought on for the purpose of getting rid of Ms. Medina through a RIF. He never thought that CCFR was brought on to get rid of any employee. Medina was never discussed. CCFR Director Shauna Lauer testified that she didn't have any reason to think and didn't feel that CCFR was brought on to get rid of Medina. She was never told that. Her testimony is that SBS wanted to get out of the child care business, which made sense to her. That's Record 991. She says, question, so his decision wasn't to eliminate Christine's position. So that's a hard, I mean, I guess Denise and Pearl. How does that fit with your answer? Because CCFR is the decision maker on who was coming over. Like, the transfer was being made. That transfer decision was made at a higher level. It was through the, you know, Jerry Basford and Dean Trappa. And then CCFR alone decided it wasn't going to bring over Ms. Medina. That's undisputed. So I think this testimony is just like, where do you start the RIF process if there's no position, if there's no child care in your department? It's a redundant position. So, you know, I guess that would be like, okay, so who RIFs her? Well, where she was working, but she wasn't going to be brought over and that was CCFR's decision alone. It wasn't Dr. Gering's decision. With respect to the breach of contract claim, it's undisputed. It's undisputed that the RIF policy applied at all times to Ms. Medina's position, that the policy authorizes a reduction in force, and that CCFR contracted to take over the administration of BioKids, that CCFR declined to offer the position to Medina, and there was no child care remaining. There was no need for her position. So the elimination of Medina's position, redundant position, was proper and authorized under university policy. It's also undisputed that the university adhered to its policy. She admits they checked every box. Medina's for-cause argument suggests that her employment could only be terminated for misconduct or performance issues, but she has cited no policy for that position. Indeed, she's admitted that at all times her position was subject to the RIF policy. And the 511's corrective action and termination policy of employees, which didn't apply here because she wasn't disciplined, can certainly coexist with the university's RIF policy. Medina cites no university policy that says that once a performance issue is articulated, that an employee is forever insulated from the application of a RIF policy. She hasn't identified any provision of the university's policy that was breached. And lastly, turning to the UPEA claim, it failed on multiple grounds. She didn't communicate any qualifying reports of a violation or suspected violation of law. It's undisputed that in her role as BioKids director, she was tasked with how to meet the desired expansion goals while maintaining state licensing. That was Statement 11 on Record 81. And there was never any danger that BioKids was going to be acting out of compliance or in violation or even suspected violation of the law. She brought up a counsel that under the UPEA, because an employee can't be retaliated for refusing to carry out a directive, that she reasonably believes was a violation of the law. But she didn't cite that provision below. She didn't use that in her motion in opposition to summary judgment. So I think that's waived. But in any event, there was never any danger that they were going to be operating in violation. I see that my time is up. If there's any questions. Okay. Thank you, counsel. I just had three quick things that I wanted to address. First, part of the due process argument is that it is the use of the RIF itself that deprived her of due process. As a career service employee, she was entitled to notice, to a pre-disciplinary hearing, to a post-termination appeal. But Dr. Deering used the RIF so she didn't have to go through that whole process. And if you look at the record, you can see that Dr. Deering is trying to drum up a reason to fire Ms. Medina in March and April of 2020. And she doesn't have one. And she even testified that she furloughed Ms. Medina because she didn't have cause to fire her. And then this idea of a reorganization and a RIF pops into her head. And that's what she uses. Wasn't all the staff furloughed for COVID? Right. The whole staff was. Bio Kids was the only child care center that furloughed its director, though. The rest of U Kids, they closed, I think, all but one of their daycare centers, but they kept all of their directors. And with the remodel, there was still work to be done. The other thing I wanted to point out is this issue about whether she could only be fired for cause. The university has basically conceded this point by conceding that she had a property interest in her position. Her property interest was created by their policies that say a career service employee has a continued expectation of employment. I also just wanted to briefly touch on the court's adoption of the defendant's proposed order at summary judgment. It's technically within its discretion. It is not reversible error on its own. It doesn't change the de novo standard here. But this court should view the whole record as a whole to ensure the trial court adequately performed its judicial function. And I think applying the proper summary judgment standard, you will find that it did not. If a court directs the moving party to draft the material facts that exist, it's highly improbable that the correct summary judgment standard is being applied. Were there any objections made to the draft order? So the local rule says that we approve it as to form. And so I suggested some language to add about the, I think it was something like the court finds the additional material facts immaterial. But that doesn't give us the ability to object to the substance, right? And I think especially in this case, the court didn't make any real findings of fact at oral argument. Well, it's not supposed to. What? It's not supposed to. Well, it didn't put anything in the record as to resolving disputes of fact for the defendants to aid them in drafting. Thank you. Thank you. This matter will be submitted.